**FILED**

**OCT 31 2013**

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

ANITA P. FLEMING,                     )
2909 Charred Wood Court               )
Forestville, MD 20747                 )
                                      )
              Plaintiff,              )
                                      )        Case: 1:13-cv-01723
       v.                             )        Assigned To : Jackson, Amy Berman
                                      )        Assign. Date : 10/31/2013
                                      )        Description: Employ. Discrim.
GALLAUDET UNIVERSITY                  )
800 Florida Avenue, NE                )
Washington, DC 20002                  )
(202) 651-5352                        )
                                      )
              Defendant.              )        **JURY TRIAL DEMANDED**
_____      )

### COMPLAINT
Job Termination Based On Age

Plaintiff ANITA P. FLEMING, hereby makes the above stated Complaint of

Discrimination based on Age under the Age Discrimination in Employment Act (ADEA).


### I. JURISDICTION AND VENUE

1.  Plaintiff ANITA FLEMING is filing this complaint as a result of receiving a Right to

    Sue Letter from the EEOC Washington Field Office.

2.  Plaintiff ANITA FLEMING is filing in this Court because her EEOC case originated

    in the District of Columbia.

3.  Venue properly lies in this court under the Age Discrimination in Employment Act

    since there is jurisdiction in federal and because the actions which plaintiff alleges to

    be discriminatory occurred while he worked for the employer in this County.

4.   The United States District Court for the District of Columbia ("USDCDC" or "this Court"), has jurisdiction over this civil action pursuant to (1) 28 U.S.C. § 1331, in that the matters in controversy arise under the Constitution and laws of the United States; (2) 28 U.S.C. § 1337, in that the matters in controversy arise under an Act of Congress regulating commerce;

5.   Further, this Court has jurisdiction to issue declaratory judgments and other relief sought herein under 28 U.S.C. §§ 2201 and 2202, in that actual controversies exist between the Plaintiff and the Defendants regarding actions and failures to act by Defendants under FLSA and other federal laws and regulations

## II.  THE PARTIES

1.   Plaintiff ANITA P. FLEMING (hereafter "Plaintiff") is a former employee of Gallaudet University ("Gallaudet" or "the employer") located in Washington, DC.

2.   Defendant Gallaudet is the world's only university with programs and services specifically designed to accommodate deaf and hard of hearing students.  It was established in 1864 by an Act of Congress, and its charter was signed by President Abraham Lincoln.

## III.  FACTS CENTRAL TO PLAINTIFF'S CLAIMS

3.   Plaintiff is an African-American a woman over the age of 40 (she was age 51 at the time of the negative action, November 18, 2011).

4.   Plaintiff worked actively at Gallaudet University for 22 years and one month (from September 29, 1989 to November 18, 2011).  She remained on the payroll until November 2012 while receiving severance pay for the number of years she had worked.

5.     Around mid-December 2008, the Plaintiff's supervisor resigned from her position and the Plaintiff began performing about half of the former supervisor's duties while continuing to perform all of her (Plaintiff's) own duties as Information Systems & Research Specialist through September 2010 (21 months).

6.     The Plaintiff worked extra-long hours daily, as well as worked most weekends and performed work at home.  She received special pay for doing the extra work.

7.     Between 2010 into 2011, the Development Office, the office in which the Plaintiff worked, lost about half its staff.  It was a very stressful time for everyone.

8.     The Plaintiff demonstrated her dedication and loyalty to the employer by performing the extra work for 21 months.

9.     On or about September 7, 2010, Sarah DuCray started her first day as Director, Research & Information Systems and the Plaintiff's supervisor.  She was a former co-worker of Lynne Murray, Vice President for Development and Alumni Relations, when Ms. Murray worked at Georgetown University between 2008 - 2010.  Ms. DuCray was the only person who was interviewed for the position.

10.     Ms. Murray worked in the Gallaudet Development Office as a fund raiser from around 1997 to 2000; she resigned her position in 2000 and returned to Gallaudet around 2001 or 2002 and resigned again in January 2008 (these dates are approximate). Sometime during 2007 when Ms. Murray was the Plaintiff's supervisor, the Plaintiff approached Ms. Murray about lying on the Plaintiff in a meeting attended by the Executive Director of Development, Ms. Murray, and the Plaintiff.  Ms. Murray admitted to lying on the Plaintiff in the meeting and apologized. (The plaintiff did not bring it up in the meeting because she felt that Ms. Murray and

the Executive Director would take sides against her and possibly make up even more untrue statements about her).

11.     Before Ms. Murray left Gallaudet in 2008, while she was the Plaintiff's immediate supervisor, she and the Plaintiff had some problems, and after the incident about Ms. Murray lying on the Plaintiff, their relationship was "strained" at best.  In May 2010, Ms. Murray returned to Gallaudet University as an employee for the third time as Vice President for Development and Alumni Relations.

12.     When she returned to Gallaudet as the Vice President of Development, the Plaintiff had a strong feeling it would not be good for her or her career.  The Plaintiff felt that Ms. Murray "had it out for her" when she returned—retaliation because the Plaintiff had confronted her about lying on her.

13.     When Ms. DuCray was hired by Ms. Murray as the Plaintiff's supervisor, she treated the Plaintiff horribly, starting from the first day.

14.     During the first few weeks, Ms. DuCray told the Plaintiff verbally that if she (DuCray) had been the Plaintiff's supervisor for the past 21 months while she (Plaintiff) was performing the special duties, she would not have paid the Plaintiff special pay for the extra work she had been doing during those months.

15.     Soon after that, Ms. DuCray presented the Plaintiff with a letter dated September 21, 2010 stating that the Plaintiff would "no longer [be] required to perform tasks outside of the scope for which you were originally hired" and would, therefore, no receive the special pay. The letter stated, "The final portion of your special compensation will be in your October 5[th] paycheck."

16.    Although the Plaintiff was told she would no longer be required to perform tasks outside of the scope for which she was originally hired, after she received the letter stating that, she was still being expected and asked by Ms. DuCray to do the additional/special work she had been doing over the 21 month period.

17.    The Plaintiff protested performing additional/special work without additional pay—work she had performed for the previous 21 months with special pay.

18.    When Ms. DuCray and the Plaintiff could not come to an amicable and fair agreement, the Plaintiff reported her concerns to the director of Human Resource Services, Elaine Vance.

19.    In December 2010, Ms. Vance, Ms. DuCray, and the Plaintiff met, and Ms. Vance and Ms. DuCray made an offer of pay to the Plaintiff to continue performing the special work. The offer was not reasonable for the work the Plaintiff was being asked to do.  Therefore, the Plaintiff refused it.

20.    After on-going communication about the situation between Ms. DuCray, Ms. Vance, and the Plaintiff, on February 9, 2011 the resolution was rather than the Plaintiff being forced to do extra without pay, she received a promotion from Information Systems & Research Specialist to Coordinator, Information Services and received a substantial pay increase retroactive to January 1, 2011.

21.    The fact that the Plaintiff received a promotion 10 months prior to being laid off indicates that she was doing an excellent job worthy of recognition.

22.    In addition to attempting to force the Plaintiff to perform work without pay, there were discriminatory practices regarding how African American employees were treated -vs- how white employees were treated.

23. Over the 22 years the Plaintiff had worked in the Development Office, she had seen and been subjected to unfair practices related to race. However, during this time after Ms. Murray returned to Gallaudet and the Development Office, these unfair actions were taken to a new level, such as white employees being allowed to work from home when African American employees were not given the same opportunity, and white employees who did not work eight hours days on a regular basis, particularly the Vice President for Development & Alumni Relations, Lynne Murray; the Executive Director of Development Operations, Danielle Yearout; and the Director of Research & Information Systems, Sarah DuCray, all whom are white, but African American employees were not afforded the same options. Most if not all the times, these white employees were not charged leave for the time they spent out of the office.

24. A very good example is the day before Thanksgiving in 2010. After working through the morning, the employees who were in the office that day, all African American, realized there were no whites employees at work. The only employees in the office were African American: the Administrative Assistant, the Assistant Director for Corporate & Foundation Relations, the Database Technician, the Special Events Coordinator, and the Plaintiff.

25. There were five African American women who had been working in the Development Office. In addition to getting rid of the older women in the Office, there was also a plan for a clean sweep of African American employees in the office. The Assistant Director for Corporate & Foundation Relations was not over 40 years old, resigned because of unfair practices and actions she experienced in the office; her last day was 9/15/2011 or 9/16/2011. The jobs of all other African American employees in the Development Office except one (the Database Technician) were closed:

a) The Special Events Coordinator, over 50 years old, who was secretly offered an early out

by Ms. Murray and told that management would be "publicly" telling everyone she was retiring and that she should to the same. Her last day was 11/4/2011.

b) An Administrative Assistant, over 50 years old, who was unexpectedly laid-off effective 11/18/2011.

c) The Coordinator for Information Services (the Plaintiff), over 50 years old, who was unexpectedly

laid-off effective 11/18/2011.

26. Sometime around April or May 2011, Lynda Carter the Database Technician, a deaf, African American woman who is also over 50 years old who had worked in the Development Office for about 25 years at that time, told the Plaintiff that while she was in the office kitchen in the morning talking to their Vice President, Lynne Murray, Ms. Murray asked her, "When are you planning to retire?" Ms. Carter said she told her she wasn't sure—in a few years. She then said to the Plaintiff that she wondered why Ms. Murray would ask her such a question.

27. On September 1, 2011, Ms. Carter and the Plaintiff (both who had worked in the office for over 20 years and were over 50 years old) were asked by the Executive Director of Development Operations, Danielle Yearout, how long they planned to work there. Ms. Yearout asked the two employees the question separately.

28. Ms. Yearout came to the Plaintiff's office in the afternoon on September 1, 2011 and asked when she was planning to retire. The Plaintiff told Ms. Yearout that she had no plans of retiring before she had worked at the University at least 30 years, which for Plaintiff would be about nine more years.

29. Ms. Yearout said that if the Plaintiff did not want to work there any longer, there were things that could be done. She presented an early out offer to the Plaintiff and immediately

went to ask Elaine Vance, Director of Human Resources what my options would be if the Plaintiff were laid-off.

30.     Within about 30 minutes, Ms. Yearout went back to the Plaintiff's office and closed the door.  She told the Plaintiff that she had talked with Ms. Vance, director of the Human Resource Services Office and said to the Plaintiff, "You won't believe what Elaine said."

31.     Ms. Yearout told the Plaintiff that when she asked Ms. Vance about what the Plaintiff could receive, Ms. Vance asked her what she meant. Ms. Yearout said Ms. Vance asked her, "Are you asking me what she could get if she was laid-off?" Ms. Yearout said that she responded to Ms Vance, "Well, yes, OK, if she was laid-off."

32.     Ms. Vance then said the Plaintiff was already qualified to retire.

33.     Also, Ms. Vance said if the Plaintiff were laid-off, she would receive 44 weeks of pay and if the Plaintiff had had her health insurance for at least five years, she could keep the same health benefits (Ms. Yearout said that she (Yearout) thinks most benefits, such as life or dental, would remain with the Plaintiff).

34.     Ms. Vance told Ms. Yearout that there is a formula for how they calculate the amount you would receive. Ms. Yearout said if the Plaintiff were interested or would consider this type of offer, then she should:

- Talk with Christina Shen, benefit specialist in the Human Resources Services Office;

- Ask Ms. Shen what would happen in the event she were laid-off or her position was closed;

- Wait until after 9/29/2011, date of the Plaintiff's 22nd anniversary so that the retirement benefits would be based on 23 years, rather than 21 years (because they are based on a 2-year scale).

35. Ms. Yearout then told the Plaintiff to get rid of the notes the she (Plaintiff) had taken regarding what she (Yearout) had told her about being laid off or early retirement. Also, Ms. Yearout told the Plaintiff that she (Yearout) was going to throw away the piece of paper which she had written the information on that she had received from Ms. Vance.

36. Ms. Yearout then told the Plaintiff that she could think about it over her (Plaintiff's) vacation, which was beginning within the next day or two, and then decide if she would accept the offer of her job being closed and entering an early retirement.

37. Ms. Yearout told the Plaintiff she was going to present the same offer to another woman in the Development Office who was over 50 years old, Patsy Bowman, and she hoped Ms. Bowman would not be offended. It just so happens that Ms. Bowman is one of the three women, age 50 or older, who was laid-off along with the Plaintiff.

38. When the Plaintiff returned from vacation, she never spoke to Ms. Yearout again about the offer Yearout had made to her on 9/1/2012.

39. The Plaintiff feels that since she did not accept the offer, or did not accept it soon enough, her job was closed.

40. Some time in September 2011 after Ms. Yearout had made the offer mentioned above to the Plaintiff, the Plaintiff's supervisor, Ms. DuCray, asked the Plaintiff to start keeping a log of each project she performed everyday and to put it on the department's shared drive.

41. The Plaintiff was already keeping that type of log for herself but found it strange that all of a sudden her supervisor asked her to do it. The Plaintiff questioned the reason and expressed that she was not comfortable putting her daily work log on a public work drive and asked Ms. DuCray the reason she wanted her to do that.

42.    Ms DuCray said that she and Ms. Yearout wanted to be able to access it. It is clear now that Ms. DuCray and Ms. Yearout wanted to find out everything the Plaintiff did so that they could document the work and assign it to others.

43.    Additionally, even though the Plaintiff's job description stated that she was to act as the Development Office liaison to the University Finance Office, she was excluded from meetings that Ms. DuCray and/or Ms. Yearout attended with Finance.

44.    This, as well as other actions by Ms. DuCray, Ms. Yearout, and Ms. Murray, demonstrates management's intentions to exclude the Plaintiff from certain responsibilities that were in her job description, probably because the plans were already set for her not to be at Gallaudet.

45.    Some time after Ms. Yearout was hired, a new student worker, Ms. Lore Ameloot, was hired to help in the team in which the Plaintiff worked, Information Systems and Research. Within the last month before the Plaintiff was laid off, two young recent graduates of the University, Nicholas Gould and Nathalie Pluvoise, were hired in the office (one around Sept. 26 or 27, and the other about one to two weeks later) without what appeared to be very specific job duties.

46.    On 9/27/2011, Ms. Pluvoise's first day, when the Plaintiff asked Ms. Pluvoise what work she would be doing in the Development Office, Ms. Pluvoise stated that she didn't know yet. She said she was just going to be looking around, working in different areas, seeing what she liked first. Then "they" would decide what she would be doing. (When using "they," she was referring to management (Ms. Yearout and/or Ms. DuCray).

47.    A Development Office employee informed the Plaintiff that during late October 2011, she had written and completed the job descriptions for Mr. Gould and Ms. Pluvoise, the

young, newly graduated employees. The two positions were given the title "Development Specialist."

48.     Rather than keep older employees, the University was able to train three new employees and student worker and pay them less than they would have to pay older employees who had worked for over 20 years. Also, the benefits to the new employees would be lower.

49.     The new, younger employees, as well as other Development employees such as Matthew Sickon, Assistant Director for Donor Relations in the age range of the 20's, were scheduled and received extensive training in The Raiser's Edge database, the software program which the Plaintiff was Manager.

50.     Although the Plaintiff's job description included training and management of the database, she was not included in most of the training or its planning. The Plaintiff was invited to about 1½ days training and was not informed on what the attendees would be learning or the reason they were learning it.

51.     The Plaintiff had to ask Ms. DuCray for that information, that is what the attendees would be learning or the reason they were learning it.

52.     These actions demonstrate that the intention of management was to train others in the office who were younger and would cost the department and university less than the Plaintiff would.

53.     On 9/19/2011, the Special Events Coordinator, an African American woman over 50 years old, who had worked in Development Office for over 20 years, told the Plaintiff that her (Special Events Coordinator's) last day would be 11/4/2011:

   a. The Special Events Coordinator told the Plaintiff that she was retiring; her job was being abolished.

b. The Special Events Coordinator told the Plaintiff that she had met with Ms. Murray around the middle of August (around 8/16/2011). Because she felt the changes that were being made by Vice President Lynne Murray were a demotion, she told Ms. Murray if that was the case, she would not staying at Gallaudet.

c. At this point, Dr. Murray told the Special Events Coordinator that there were other Options and proposed to her the option of being laid off (or having her position closed) but that they (Gallaudet) would say publicly that the Special Events Coordinator was retiring. She then told the Special Events Coordinator to go to talk with Elaine Vance, Director of Human Resource Services about the details.

d. The Special Events Coordinator said in her meeting with Vance that she (Vance)) told her:
   o If your job is abolished or you are laid-off, you are at least 50 years old, and have been at Gallaudet for at least 20 years, you are eligible for retirement.
   o You would get two weeks severance pay for each of your years at Gallaudet.
   o You can keep health insurance at the same rate you pay now.

e. When the Special Events Coordinator came back and informed Ms. Murray that she had talked to Ms. Murray, she (Murray) asked the Special Events Coordinator if she thought the Plaintiff would be interested in an opportunity like the one they just offered her. The Special Events Coordinator told Ms. Murray she did not know. Then Ms. Murray asked the Special Events Coordinator if she would talk to the Plaintiff about it. The Special Events Coordinator said no, she would not. She told Ms. Murray that they (Ms. Murray and/or Ms. Yearout) would need to talk to the Plaintiff about it." The Plaintiff's confidentiality may have been breached because: ***You should expect confidentiality from your employer regarding matters such as medical information, credit and financial information, and***

***education information, according to the Employment Law Information Network. Other***

***confidences include social security numbers, addresses and phone numbers, drug test***

***results and treatment, disclosure of union activity, personal history questionnaires and***

***investigations.***

f. Ms. Murray then told the Special Events Coordinator that they were going to "clean

house." On 9/24/2011, the Special Events Coordinator told the Plaintiff by phone that in addition

to Dr. Murray saying it, that Ms. Yearout had also told her that they were going to "clean

house," particularly for the fund raiser employees.

54.     The information immediately above demonstrates that Ms. Murray and Ms.

Yearout already had plans (during August 2011 when the early out was offered to the Special

Events Coordinator) to get the Plaintiff as well as other employees out of the Development

Office. The conversation that Ms. Yearout had with the Plaintiff on 9/1/2012 when she said she

had not spoken to anyone else about this type offer was untrue.

55.     There was collusion between the Ms. Murray, the Vice President for Development

and Alumni Relations, Ms. Yearout, the Executive Director of Development Operations, and Ms.

DuCray, the Director of Research & Information Systems to eliminate my position

56.     Ms. Yearout is a Gallaudet employee who has the reputation of being put into

departments and getting rid of people who management does not want at Gallaudet any longer.

In the Spring of 2011, she was hired as Executive Director of Development Operations.

57.     On September 1, 2011, Ms. Yearout, Executive Director of Development

Operations, secretly presented the Plaintiff with an early-out offer.

58.     When the Plaintiff did not accept it or did not mention it to her, the Plaintiff was informed her job would be eliminated.

59.     On 11/4/2011 between around 9:30 – 10:30 am, Ms. Yearout came to the Plaintiff's office and informed her that her job had been eliminated and her official last day would be 11/18/2011. The Plaintiff was one of three females over the age of 50 in my office who was laid-off on that day. Two of the women were hearing African-American women, and one was a deaf white woman. Also, it was the last day for another African American woman who accepted management's secret offer for her job to be closed but to announce publicly that she was retiring voluntarily.

60.     Employees of Gallaudet University are covered under Federal government benefits programs , but although the University has an EEO Director, it had been apparent in the past that the Human Resource Services Office and EEO offices put the interest of the University before that of the employees. Therefore, the Plaintiff did not inform the Human Resource Services Office or the EEO Director.

61.     An African-American female over the age of 50, the Plaintiff was laid-off without warning and forced into taking an early retirement which has forced her into the position of searching for a new job because she cannot live on the amount of money she now receives through retirement (it is less than 1/3 of the salary she was receiving when she was laid-off.

62.     In addition, it has eliminated her ability to earn the funds which would have been deposited into her retirement fund over the next 10-13 years when she normally would have retired.

63.     The Plaintiff should be compensated for that lost time.

64.     She no longer has the opportunity to receive training or certifications offered through the employer which would keep her current and up-to-date so that she can remain competitive in today's quickly changing workforce.

65.     Now, it is very difficult for the Plaintiff to be hired at her age.

66.     The Plaintiff has been unemployed since her termination.

## IV.  STATEMENT OF CLAIM

### Count I:  Age Discrimination

67.     The employer unlawfully discriminated against Plaintiff on the basis of her age.

68.     There was a plan for a clean sweep that was focused on older women (over 50 years old) in the Gallaudet University Development Office:

a.  During 2011, it was noticed that young people were being hired in the Development Office. A current student intern was hired and it was said by the Vice President of Development and Alumni Relations that "we will keep her for the next two years." Then very soon after Danielle Yearout was hired as Executive Director of Development Operations, she hired two Gallaudet University alumni as Development Specialists. These new employees had recently graduated with bachelor degrees from Gallaudet.

b.  In November 2011, four (4) jobs held by women employees over the age of 50 in the Development Office were closed:

   - Assistant Director for Annual Fund

   - Administrative Assistant

   - Special Events Coordinator (who agreed to accept her job being closed but publicly announcing that she was retiring voluntarily) – **She does not want to**

**be a witness for the charge.**

- Coordinator of Information Services (the Plaintiff).

c.  The new, young employees (as well other Development employees who were under 40 or 50 years of age) were trained before the jobs of the older employees were closed while they could still provide information about the positions.

d.  Similarly, approximately 13 months earlier on the morning of July 9, 2010, three employees were laid off unexpectedly:  an Administrative Assistant (An African American woman; not sure of her age), the Director of Major and Planned Gifts (a white woman over age 50), and the Executive Director of Development (a white woman over age 50).

69.    The employer created a hostile work environment for Plaintiff by asking her when she planned to retire from the university and by training new, younger employees in areas of the Plaintiff's responsibilities, therefore discriminating against her on the basis of her age.

70.    As a result of the employer's malicious violations of the ADEA, the Plaintiff has suffered and is suffering injuries, including loss of past, present, and future earnings and considerable mental distress.

71.    By so discriminating against Plaintiff on the basis of age, the employer maliciously violated the Age Discrimination in Employment Act (ADEA).

## VI. EXHAUSTION OF ADMINISTRATIVE REMEDIES

72.    On 9/7/2012, the Plaintiff called the national Equal Employment Opportunity Commission (EEOC) at the national telephone number, 1-800-669-4000, and asked the EEOC representative who answered the phone, whose name was Wayne, which date the filing of this

her EEOC complaint was based on: the date of the letter (date Plaintiff was informed) which was 11/4/2011, or the effective date of the termination stated in the letter which was 11/18/2011.

73.   The EEOC telephone representative told the Plaintiff that filing was determined by the **effective date** and that she was still in time to proceed and file the EEOC complaint.

74.   Wayne of EEOC confirmed that the Plaintiff had until 9/13/2012 to file a discrimination case for actions taken against her as of the effective date in the letter, 11/18/2013.

75.   The only reason the Plaintiff proceeded to file the EEOC complaint by 9/13/2012 was because she was instructed to do so by the national EEOC office and was told by the EEOC employee, Wayne, that filing by until 9/13/2012 would be timely.

76.   Wayne, the EEOC representative, instructed the plaintiff to send a "Hotline Letter" to the EEOC Washington Field Office via fax either in addition to or instead of an Intake Questionnaire in order to file an EEO charge as soon as possible.

77.   At the instruction of EEOC employee, Wayne, on 9/12/2012, the Plaintiff faxed a "HOTLINE LETTER," along with the completed Intake Questionnaire, to the EEOC Washington Field Office.

78.   Then on 9/13/2012, the Plaintiff hand-carried the original completed EEOC Intake Questionnaire along with about 24 pages of background documentation and filed it at the EEOC Washington Field Office where the Intake Questionnaire was assigned Case Number 570-2012-02364N.

79.   All EEOC personnel with whom the Plaintiff spoke between 9/12/2012 and 5/9/2013 (the day of the mediation with the former employer) accepted her EEOC complaint as being filed timely and in order.  This was true whether the personnel were at the Washington Field Office or via the EEOC's national telephone number, 1-800-669-4000.

80.     The first letter the Plaintiff received was from EEOC Enforcement Intern Kaitlyn

Degnan indicated the EEOC Office had received her Intake Questionnaire in which she alleged

employment discrimination by the employer.  The letter further stated that "The information [the

Plaintiff] provided indicates that the matter complained of is subject to the statues{s} checked

off below:"

81.     The statute checked off was "The Age Discrimination in Employment Act

(ADEA).

82.     However, that letter had a typographical error in it which the Plaintiff brought to

Ms. Degnan's attention.

83.     Ms. Degnan corrected the letter and re-sent it to the Plaintiff.

84.     On or about 10/3/2012, the Plaintiff received the corrected letter signed by Ms.

Degnan and dated 9/28/2012.

85.     The Plaintiff received a letter dated 4/26/2013 that it was in response to both

parties agreeing to participate in the mediation program."

86.     The mediation session was held on 5/9/2013.

87.     The employer submitted a Motion to Dismiss the EEOC C's Complaint stating that

the Plaintiff's claim had filed untimely.

88.     On August 2, 2013, the Plaintiff received a Notice of Right to Sue Letter from the

EEOC.

89.     This complaint is filed within 90 days after Plaintiff received the Notice of Right to

Sue on his EEOC complaint.

90.     Plaintiff has, therefore, exhausted all available administrative remedies which may

be conditions precedent to bringing this action.

## VI.  RELIEF

91.    The Plaintiff seeks relief through monetary damages.

## VII.  JURY TRIAL DEMAND

92.    Plaintiff requests a jury trial on all issues of fact and damages arising herein.

## VERIFICATION

I hereby certify under penalty of perjury that I am the Plaintiff in the above-captioned

case; that I have read the foregoing Complaint; and that the facts related herein are true and

correct to the best of my knowledge, information, and belief.

Executed at Washington, DC, this __3/st__ day of October, 2013.

Respectfully Submitted,

Date: _10/31/2013_                          Signature: _Anita P. Fleming_
                                                                    Plaintiff

Name (Typed or Printed):  Anita P. Fleming

Address:  2909 Charred Wood Court
                 Forestville, MD  20747

Telephone Nbr.:  301-922-5172

**PLAINTIFF: ANITA P. FLEMING**
**OCTOBER 31, 2013**

**Brief Statement of Cause**

---

The Plaintiff worked at Gallaudet University in the Development Office from September 29, 1989 to November 18, 2011. After being laid off, she remained on the payroll until November 2012 while receiving severance pay for the number of years she had worked.

Around mid-December 2008, the Plaintiff's supervisor, the Coordinator of Information Systems, resigned her position, and at that point, the Plaintiff began performing about half of her duties and continued performing all her duties as Information Systems & Research Specialist through September 2010. the Plaintiff worked extra-long hours daily, as well as worked most weekends and performed work at home, just to keep up. The Plaintiff received special pay for doing the extra work. Between 2010 into 2011, the Development Office lost about half its staff. So, it was a very stressful time the Plaintiff for everyone.

On November 4, 2011 between around 9:30 – 10:30 am, the Plaintiff was informed that her job had been eliminated, and although her official last day 11/18/2012, the Plaintiff would not have to return to work after 11/4/11. The Plaintiff is one of three females over the age of 50 in the Development Office who was laid-off on that day. Two of us were hearing African-American women, and one was a deaf white woman. Also, it was the last day for another African American woman who accepted management's secret offer for her job to be closed but to announce publicly that she was retiring voluntarily.

Employees of Gallaudet University are covered under Federal government benefits programs such as the Employees Health Benefits (FEHB) and the Federal Employee Retirement System (FERS). However, although the University has an EEO Director, it has been apparent that in the past, the Human Resources and EEO offices put the interest of the University before that of the employees.

An African-American female over the age of 50, the Plaintiff was laid-off without warning and forced into taking an early retirement which has forced the Plaintiff into the position of searching for a new job because the Plaintiff cannot live on the amount of money she now receives through retirement (less than 1/3 the salary the Plaintiff was receiving when she was laid-off. In addition, it has eliminated the Plaintiff's ability to earn the funds which would have been deposited into her retirement fund over the next 10-13 years when she normally would have retired. The Plaintiff should be compensated for that lost time. Also, she no longer has the opportunity to receive training and certifications, offered through the employer which would keep her current and up-to-date, so that the Plaintiff can remain competitive in today's quickly changing workforce. Now, it is very difficult for the Plaintiff to be hired at her current age, 53.

**EEO REASON FOR DISCRIMINATORY ACTION: AGE (51 years old at the time of the negative action).**

**AGE DISCRIMINATION**

1) There was a plan for a clean sweep that was focused at all older women (over 50 years old) in the Gallaudet University Development Office. Both the Vice President for Development and Alumni Relations and the Executive Director of Development Operations told a Development office employee that they "were going to clean house," particularly among the fund raiser employees.

   a. During the Spring and Summer of 2011, it was noticed that young people were being hired in the Development Office. A current student intern was hired and it was said that "we would keep her for the next two years." Then very soon after Danielle Yearout was hired as Executive Director of Development Operations, she hired two Gallaudet University alumni who had recently graduate with bachelor degrees were hired as Development Specialists.

   b. In November 2011, four (4) jobs already held by women employees over the age of 50 in the Development Office were closed:
      - Assistant Director for Annual Fund
      - Administrative Assistant
      - Special Events Coordinator (who agreed to accept her job being closed but publicly announcing that she was retiring voluntarily).
      - Coordinator of Information Services (Plaintiff).

   c. The new, young employees, as well other Development employees who were under 40 years of age, were trained before our jobs were closed and while we could still provide information about the positions, and although the younger employees did perform many of the duties.

   d. Similarly, 13 months earlier on the morning of July 9, 2010, three employees were laid-off unexpectedly: an Administrative Assistant (An African American woman; the Plaintiff is not sure if she was over 40 years old), the Director of Major and Planned Gifts (a white woman over age 50), and the Executive Director of Development (a white woman over age 50).

DATE: 10/31/2013          SIGNATURE: _Anita P. Fleming_
                                    **Anita P. Fleming**